Jason R. Flanders (Bar No. 238007)
Erica A. Maharg (Bar No. 279396)
Aqua Terra Aeris (ATA) Law Group
4030 Martin Luther King Jr. Way
Oakland, California 94609
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com
Email: eam@atalawgroup.com

Drevet Hunt (Bar No. 240487)
California Coastkeeper Alliance
1100 11th Street, 3rd Floor
Sacramento, California 95814
Phone: (415) 606-0864
Fax: (415) 520-6125
Email: dhunt@cacoastkeeper.org

Daniel Cooper (Bar No. 153576)
Sycamore Law
1004 O'Reilly Ave
San Francisco CA 94129
Phone: (415) 360-2962
Email: daniel@sycamore.law

Attorneys for Plaintiff
CALIFORNIA COASTKEEPER ALLIANCE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| CALIFORNIA COASTKEEPER ALLIANCE, a California non-profit corporation, | Case No.: 2:21-cv-01916-WBS-KJN |
| Plaintiff, | **CONSENT DECREE** |
| v. | |
| COUNTY OF SACRAMENTO, a municipality, SACRAMENTO AREA SEWER DISTRICT, a California county sanitation district, and SACRAMENTO COUNTY DEPARTMENT OF WATER RESOURCES, | |
| Defendants. | |

**CONSENT DECREE**

The following Consent Decree is entered into by and between Plaintiff California Coastkeeper Alliance ("Plaintiff" or "Alliance"), and defendants County of Sacramento ("County"), Sacramento Area Sewer District ("SASD"), Sacramento County Department of Water Resources ("DWR") (collectively "Defendants").  The entities entering into this Consent Decree are each an individual "Settling Party," and collectively "Settling Parties."

**WHEREAS**, the Alliance is a non-profit public benefit corporation dedicated to developing, implementing, and defending policies that meet the needs of California's distinct communities and ecosystems.  The Alliance also seeks federal and state agency implementation of the CWA and, where necessary, initiates enforcement actions on behalf of itself and its members.  The Alliance's members use and enjoy waters including but not limited to the Mokelumne River, Dry Creek, Morrison Creek, the American River, and the Sacramento River;

**WHEREAS**, the County is a political subdivision of the State of California and is a co-permittee under California Regional Water Quality Control Board, Central Valley Region NPDES Permit No. CAS0085324, Order No. R5-2016-0040 ("2016 MS4 Permit"), along with Cities of Citrus Heights, Elk Grove, Folsom, Galt, Rancho Cordova, and Sacramento, and which 2016 MS4 Permit regulates Storm Water Discharges from its Municipal Separate Storm Sewer System (MS4),;

**WHEREAS**, SASD is a County Sanitation District pursuant to and operating under the County Sanitation District Act;

**WHEREAS**, on August 13, 2021, the Alliance provided the Defendants, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator for Region IX of the EPA, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the California Regional Water Quality Control Board, Central Valley Region ("Regional Board") with a Notice of Violation and Intent to File Suit ("Notice Letter") under section505(a) of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a).  The Notice Letter alleged that Defendants violated and continue to violate the Clean Water Act for discharges of pollutants in violation of the Clean Water Act, the 2002 MS4 Permit, and/or the 2008 MS4 Permit;

**WHEREAS**, on October 14, 2021, Plaintiff filed its complaint in the United States District Court for the Eastern District of California ("District Court") against Defendants, Case No.2:21-cv-01916-WBS-KJN (hereinafter "Complaint");

**WHEREAS**, the Alliance believes that this Consent Decree will make substantial progress towards eliminating discharges of sanitary sewage into Waters of the United States, as required by the Clean Water Act;

**WHEREAS**, Defendants deny the Alliance's allegations that they have violated the Clean Water Act and/or any of the permits as alleged in the Complaint;

**WHEREAS**, the Settling Parties, through their authorized representatives and without either adjudication of the Complaint's claims or admission by Defendants of any alleged violation or other wrongdoing, have chosen to resolve this action through settlement and avoid the costs and uncertainties of further litigation;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties each hereby agree as follows:

## I.   GENERAL OBJECTIVES

1.      The objectives of this Consent Decree are:

a.      To ensure that Defendants use, implement, and improve ways, means, and methods to prevent sanitary sewer overflows; and

b.      To ensure that Defendants use, implement, and improve ways, means, and methods to prevent violations of, or to comply with, applicable permits, laws, and regulations as related to sanitary sewer overflows.

## II.       DEFINITIONS

2.      Unless otherwise expressly defined herein, terms used in this Consent Decree, which are defined in the CWA, Porter-Cologne, or in regulations implementing these statutes, have the meaning assigned to them in the applicable statutes, regulations, or rules.  Whenever terms listed below are used in this Consent Decree, the following definitions apply:

a.      "CCTV" means closed-circuit television or other comparable technologies such as technology combining video with sonar data that delineates the cross section of the pipe, or utilizing a

1   robot that takes many pictures as it travels down the pipe and then stitches the pictures together to create

2   a frame-by-frame video.

3           b.     "County" means the County of Sacramento, California.

4           c.     "SASD" means the Sacramento Area Sewer District.

5           d.     "Condition Assessment" means an evaluation of the structural and maintenance

6   condition of a Sewer Main based on CCTV inspection that results in documentation of the structural and

7   maintenance condition of the inspected Sewer Main.

8           e.     "Alliance" means California Coastkeeper Alliance.

9           f.     "Day" means a calendar day.  In computing any period of time under this Consent

10  Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, or furlough

11  day that results in the closure of SASD offices, the period runs until the close of business on the next

12  day that is not a Saturday, Sunday, or Federal or State Holiday, or furlough day.

13          g.     "Fiscal Year" means SASD's fiscal year of July 1 through June 30.

14          h.     "Calendar Year" means January 1 through December 31.

15          i.     "FOG" means fats, oils, and grease.

16          j.     "Lower Lateral" means the portion of the sewer lateral line owned and/or

17  operated by the Defendants connecting a home or other structure to the Defendants Sewer Main

18  extending from the sewer main to the back to the Defendant's cleanout, or, in the absence of a cleanout,

19  to the limits of the public right of way, Defendants' or other public sewer easement where the

20  Defendants maintain sewer infrastructure, or public utility easement, whichever is applicable to the

21  lateral line.  Lower Laterals are generally connected to Upper Laterals.

22          k.     "MS4" means the municipal separate storm sewer system owned or operated by

23  the County of Sacramento or any other permittee on the 2008 MS4 Permit.  The MS4 includes the entire

24  "municipal separate storm sewer" as that term is defined in 40 C.F.R. § 122.26(b)(8).

25          l.     "County MS4" means the municipal separate storm sewer system owned or

26  operated by the County of Sacramento, and includes the entire municipal separate storm sewer system

27  under the County's jurisdiction that meets the definition set forth in 40 C.F.R. § 122.26(b)(8).

28  ///

1    m.    "NPDES" means National Pollutant Discharge Elimination System.

2    n.    "Upper Lateral" means the private sanitary sewer lateral line connecting a home

3 or other structure to the Lower Lateral, generally extending from the outside of the foundation of the

4 structure to the Defendant's cleanout, or, in the absence of a cleanout, to the limits of the public right-of-

5 way, Defendants' or other public sewer easement where the Defendants maintain sewer infrastructure,

6 or public utility easement to the public right-of-way or the Defendants' cleanout, whichever is

7 applicable.

8    o.    "Sanitary Sewer Overflow" or "SSO" means:  "any overflow, spill, release,

9 discharge or diversion of untreated or partially treated wastewater from the Collection System. SSOs

10 include:  (i) Overflows or releases of untreated or partially treated wastewater that reach waters of the

11 United States; (ii) Overflows or releases of untreated or partially treated wastewater that do not reach

12 waters of the United States; and (iii) Wastewater backups into buildings and on private property that are

13 caused by blockages or flow conditions within the publicly owned portion of a sanitary sewer system."

14 For purposes of this definition, "waters of the United States" has the meaning as set forth in 40 C.F.R.

15 § 122.2.Temporary storage and conveyance facilities (such as vaults, temporary piping, wet wells,

16 construction trenches, impoundments, tanks, etc.) are considered to be part of the sanitary sewer system,

17 and discharges and/or diversions into these temporary storage facilities that do not discharge to waters of

18 the United States are not considered to be SSOs.

19    p.    "Category 1 SSO" means any SSO that reaches a surface water and/or reaches a

20 drainage channel tributary to a surface water; or reaches a Municipal Separate Storm Sewer System

21 (MS4) and is not fully captured and returned to the sanitary sewer system or not otherwise captured and

22 disposed of properly.

23    q.    "Sewer Main" means any section of publicly owned sewer line or pipe located

24 between:  (1) two manholes/maintenance holes; (2) a pump station and a manhole/maintenance hole;

25 (3) a pump station or a manhole/maintenance hole and a headworks structure; or (4) a sewer line or pipe

26 otherwise identifiable as a discrete section.

27    r.    "SSMP" means the Sewer System Management Plan developed and implemented

28 by SASD for the Collection System in accordance with the SSO WDR.

s.      "Collection System" means the sewer lines, manholes or maintenance holes, pump stations, and all appurtenances thereto under ownership of and/or operation by SASD that are used to convey wastewater generated by residential, commercial, and industrial sources within unincorporated areas of the County of Sacramento and the cities of Sacramento, Elk Grove, Rancho Cordova, Folsom and Citrus Heights to the sewage collection system owned and operated by the Sacramento Regional County Sanitation District ("SRCSD"), where it is subsequently delivered to the Sacramento Regional Wastewater Treatment Plant.  For purposes of this Consent Decree, the Collection System does not include Upper Laterals or other privately owned or operated infrastructure that connects to the Collection System.

### III.      JURISDICTION AND VENUE

3.      For purposes of settlement, the Settling Parties stipulate to the Court's jurisdiction to enter this Consent Decree.

### IV.      EFFECT OF CONSENT DECREE

4.      Plaintiff does not, by their agreement to this Consent Decree, warrant or aver in any manner that the Defendants' compliance with this Consent Decree will constitute or result in compliance with any Federal or State law or regulation.  Nothing in this Consent Decree shall be construed to affect or limit in any way the obligation of the Defendants to comply with all applicable Federal, State and local laws and regulations governing any activity required by this Consent Decree.

5.      Nothing in the Consent Decree shall be construed as an admission by Defendants, and does not intend to imply any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Decree be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law.

### V.      APPLICABILITY

6.      The provisions of this Consent Decree apply to and bind the Settling Parties, including any successors or assigns.

7.      The Settling Parties agree not to contest the validity of this Consent Decree in any subsequent proceeding to implement or enforce its terms.  By entering into this Consent Decree

Defendants do not admit liability for any purposes as to any allegation or matter arising out of the Notice Letter and/or Complaint.

8.      No change in ownership or corporate or other legal status of the Defendants or any transfer of the Defendants' assets or liabilities shall in any way alter the responsibilities of the Defendants or any of its successors or assigns thereof, under this Consent Decree.  In any action to enforce this Consent Decree, the Defendants shall not raise as a defense the failure by any of its agents, servants, contractors, employees, and successors or assigns to take actions necessary to comply with this Consent Decree.

## VI.      EFFECTIVE DATE AND TERMINATION DATE

9.      The term "Effective Date," as used in this Consent Decree, shall mean the last date on which the signature of a party to this Consent Decree is executed.

10.      This Consent Decree will terminate no more than five (5) years and six (6) months from the Effective Date.  If any Settling Party has invoked the dispute resolution process pursuant to Section XVI and the dispute has not been resolved at the time the Consent Decree would otherwise terminate, the Consent Decree shall continue in effect until the dispute is resolved, either through mutual agreement of the Settling Parties or by the Court.

## VII.      SSO AND SPILL REDUCTION PERFORMANCE STANDARDS

11.      <u>SSO Reduction</u>.  It is the goal of this Consent Decree to reduce SSOs from the Collection System.  SASD shall reduce Category 1 SSOs from non-lateral assets as provided in Table 1, and all SSOs from Lower Laterals as provided in Table 2 ("SSO Reduction Performance Standards"), which Defendants shall not exceed in a particular calendar year.

///

///

///

**Table 1: Non-lateral Category 1 SSOs**

| Calendar Year | Non-Lateral SSO Reduction Performance Standard |
|---|---|
| 2023 | 14 |
| 2024 | 12 |
| 2025 | 9 |
| 2026 | 7 |
| 2027 | 5 |

**Table 2: Lateral SSOs**

| Calendar Year | Lateral SSO Rate Reduction Performance Standard |
|---|---|
| 2023 | 21 |
| 2024 | 18 |
| 2025 | 16 |
| 2026 | 13 |
| 2027 | 10 |

12.     Non-lateral Category 1 SSOs equal to or less than 35 gallons before cleanup, and non-lateral category 1 SSOs where 95% or more of the total spill volume is captured or cleaned, shall not count towards the SSOs included in the SSO reduction performance standards in Table 1. Lateral SSOs equal to or less than 10 gallons before cleanup, and lateral SSOs where 95% or more of the total spill volume is captured or cleaned, shall not count towards the SSOs included in the SSO reduction performance standards in Table 2.

13.     Compliance with Table 1 shall be determined by totaling all Category 1 SSOs, as described in paragraph 12, from the Collection System except Lower Laterals during each calendar year.

14.     Compliance with Table 2 shall be determined by totaling all SSOs, as described in paragraph 12, from lower laterals reported by SASD in each calendar year.  The length of lateral pipe will be the length as reported in the Annual Report required by Section XIII of this Consent Decree. The rate shall be obtained by dividing the total SSOs by every 100 miles of lateral pipe length.

15.     Failure to meet the SSO Reduction Performance Standards in any particular Year shall be a violation of this Consent Decree.

## VIII.   SSO REDUCTION ACTION PLAN

16.     SASD shall report any failure to meet the SSO Reduction Performance Standards in each Annual Report required under Section XIII of this Consent Decree. In the event SASD fails to meet an SSO Reduction Performance Standard for any particular calendar year (as set forth in Tables 1 and 2), SASD shall prepare an SSO Reduction Action Plan and submit it to the Alliance concurrently with SASD's Annual Report. An SSO Reduction Action Plan prepared pursuant to this Section shall specify the actions taken in the calendar year for which the Annual Report was submitted that were designed to achieve compliance with the SSO Reduction Performance Standards, and shall specify additional measures to be taken, potentially including but not limited to, increase inspections, cleaning, repair, replacement, outreach, and/or enforcement, during the next fiscal year and/thereafter to achieve compliance with the SSO Reduction Performance Standards. SASD shall identify how each measure to be taken in the current fiscal year is anticipated to achieve compliance with the applicable SSO Reduction Performance Standard.

17.     If an Action Plan is triggered by Table 1, SASD shall implement the following program changes, or explain in writing why such change is not required to achieve compliance with the Table 1 SSO Reduction Performance Standards in the next fiscal year:

- Conduct a Condition Assessment of a minimum of 1,500,000 feet of main lines in the SASD Collection System per fiscal year;
- Complete a prioritized CCTV inspection and condition assessment of the Unassessed Main Lines on a rolling annual average of at least 3,800 lines per fiscal year;
- Clean a minimum of at least five million (5,000,000) feet of main line in the Collection System per fiscal year;

1             • Evaluate additional assets for potential inclusion in the Critical Assets Near Waters of the

2               United States program (which is described below).

3      18.     If an Action Plan is triggered by Table 2, SASD shall implement the following program

4 changes, or explain in writing why such change is not required to achieve compliance with the Table 2

5 SSO Reduction Performance Standards in future years:

6             • Complete a prioritized CCTV inspection and condition assessment of all Unassessed

7               Lower Laterals a rolling annual average of at least 21,000 Lower Laterals per fiscal year.

8             • Lower Laterals that experience repeat stoppages, defined in accordance with the current

9               version of the Lower Lateral Stoppage Failure Mode Strategy as Lower Laterals that

10            experience a stoppage that occurs within the Lower Lateral's designated cleaning

11            frequency, shall be repaired or replaced in a time period that is less than the time period

12            between the date the repeat stoppage occurred and the date the Lower Lateral was last

13            cleaned.

14             • At a minimum, at least 20,000 unique Lower Laterals in the Collection System shall be

15            replaced, repaired, or cleaned per fiscal year.  Lower Laterals that are cleaned and

16            inspected as part of the Lower Lateral Scheduled Inspection program shall not be

17            included as Lower Laterals that are cleaned for purposes of compliance with this

18            Paragraph.

19      19.     The Alliance shall provide the Defendants, in writing, with all recommended revisions to

20 the SSO Reduction Action Plan within forty-five (45) Days of receipt of such SSO Reduction Action

21 Plan.  SASD shall consider each of the Alliance's recommended revisions and indicate within

22 forty-five (45) Days of receipt whether SASD accepts each such recommended revision. For each

23 recommended revision not accepted, if any, SASD shall provide a written explanation for its refusal to

24 accept said revision.  SASD shall implement all agreed upon provisions and/or revisions of the SSO

25 Reduction Action Plan. If the SASD does not accept each and all of the Alliance's recommendations,

26 then the Alliance may seek dispute resolution pursuant to Section XVI  of this Consent Decree. In the

27 event Defendants fail to achieve the SSO Reduction Performance Standard more than once during the

28 life of the Consent Decree, in any subsequent dispute resolution process, the Defendants shall have the

burden of demonstrating that the elements or actions set forth in the SSO Reduction Action Plan are designed and anticipated to achieve compliance with the SSO Reduction Performance Standards set forth in Table 1 of this Consent Decree.

20.     SASD shall implement the agreed upon portions of any SSO Reduction Action Plan as an enforceable requirement of this Consent Decree.

21.     SASD shall begin implementation of any disputed portions of any SSO Reduction Action Plan as an enforceable requirement of this Consent Decree as soon as possible but not more than thirty (30) Days following resolution of any dispute resolution process related to those disputed portions of such SSO Reduction Action Plan.

## IX.     SSO INVESTIGATION, RESPONSE, AND REPORTING

22.     Within ninety (90) Days of the Effective Date, SASD shall maintain its SSO Sanitary Sewer Overflow Response Procedures to include:

a.     Training for all SASD personnel responsible for SSO investigation, response, and reporting based on the current version of the SASD Sanitary Sewer Overflow Emergency Response Procedures Manual ("SSOERPM").  Training shall be performed at a frequency of no less than once each calendar year.  Personnel responsible for responding to SSOs shall be trained on proper implementation of the SSOERPM prior to performing SSO Response Work.

b.     A requirement to record if roots, debris, or FOG entering the Collection System from an Upper Lateral was a cause of an SSO.  In such cases, SASD shall require the property owner(s) to remediate the cause of the roots, debris, or FOG entering the Upper Lateral.

## X.     SEWER INSPECTION AND CONDITION ASSESSMENT

23.     SASD shall conduct a Condition Assessment of a minimum of 600,000 feet of main lines in the SASD Collection System annually for the next five fiscal years after the Effective Date.

24.     Clean and/or rehabilitate assessed sewer lines in accordance with the Television Inspection Manual and the Main Line Repair-Maintain-Replace Decision Policy, attached hereto as Attachments 1 and 2. All main line pipes with structural defects rated as "Severe" shall be rehabilitated no later than 12 months for PACP 4 & 5 equivalent from the date CCTV inspection was performed on the main line; or, if rehabilitation within 12 months of that date is not feasible due to conditions outside

SASD's control, shall be repaired or mitigated through additional inspection, cleaning, and/or other actions, as appropriate to the defect.  All main line pipes with maintenance defects such as roots, grease, or solids/debris rated as "Severe" shall be cleaned no later than 12 months from the date CCTV inspection was performed on the main line.

25.     SASD shall complete a prioritized CCTV inspection and condition assessment of 4,116 Unassessed Main Lines in the next five fiscal years after the Effective Date.

26.     At a minimum, SASD shall inspect no less than 8,000 Lower Laterals annually for the next five fiscal years after the Effective Date.

## XI.     MAIN LINE SEWER AND LOWER LATERAL CLEANING PROGRAMS

27.     SASD shall identify the main lines that were removed from the Main Line Scheduled Maintenance ("MLSM") program after 2019 and placed on the Main Line Scheduled Inspection ("MLSI") program.  SASD shall determine if the main lines moved from MLSM to MLSI after 2019 need one-time cleanings until MLSI program TVI can be completed. If the MLSI program results show that a main line should be placed on MLSM and removed from MLSI, the appropriate cleaning frequency will be chosen and the asset will be placed back on MLSM, based on SASD's main line repair, maintain, replace decision policy.

## XII.     CRITICAL ASSETS NEAR WATERS OF THE UNITED STATES

28.     SASD shall develop and implement an inspection program focused on assets near waters of the United States.  The goal of this Program is to identify and prioritize pipe inspections of main lines that have a higher risk of SSOs reaching waters of the United States.  Pipe segments inspected under this program will be scheduled for maintenance, repair, rehabilitation, or replacement as needed in accordance with SASD's Main Line Repair-Maintain-Replace Decision Policy.

29.     As part of this Program, SASD shall identify main line sewer segments meeting any of the following criteria:  (1) within 125 feet of a water of the US; (2) those pipe segments that cross waters of the United States.

30.     For pipe segments identified pursuant to Paragraph 29, SASD shall inspect those pipes pursuant to the schedule in paragraphs 31 and 32.

31.     For those pipe segments that are within 125 feet of a water of the United States, SASD shall CCTV inspect those pipe segments every five years.

32.     For those pipe segments that cross a water of the US, SASD shall visually inspect for corrosion, erosion, and structural issues as shown in Table X and Table X2.

33.     Table X2 is for post storm visual inspections. Aerial crossings not attached to a bridge structure and exposed crossings without encasements will be inspected within five business Days following a storm greater than the 2-year return period (6 or 24-hour duration) storm as determined following the Hydrology Standards of the Sacramento County/City Drainage Manual (December 1996).

**TABLE X**

| Minimum Inspection Frequency (Years) | Crossing Type |
|---|---|
| 1 | •Aerial not attached to bridge structure<br>•Exposed without encasement |
| 2 | •Exposed with degrading encasement |
| 3 | •Aerial attached to bridge structure |
| 5 | • Covered by 1' or less |

**TABLE X2**

| Rainfall Event Triggers | | | |
|---|---|---|---|
| Inspection Criteria | Storm Return Period | Storm Duration | Total Volume |
| • Aerial Crossings not attached to bridge structure | 2-Year | 6 Hour | 1.06 inches |
| • Exposed crossings without encasements | 2-Year | 24 Hour | 1.90 inches |

34.     Sewer lines included in the Critical Assets Near Waters of the US program shall be counted towards the inspection, assessment, replacement and repair requirements of Paragraphs 23-26, above.

### XIII.   ANNUAL REPORT ON COLLECTION SYSTEM

35.     Within ninety (90) Days after the end of each calendar year that this Consent Decree remains in effect, Defendants shall submit an Annual Report to the Alliance.  The Annual Report shall detail Defendants' compliance with this Consent Decree during the preceding calendar year, including:

  a.     A statement and explanation of SASD's compliance or non-compliance with the SSO Reduction Performance Standards for the previous calendar year;

  b.     A summary of the miles of main lines and the number of Lower Laterals that were inspected and assessed in the previous calendar year;

  c.     A summary of the miles of sewer lines and number of Lower Laterals repaired, rehabilitated and/or replaced during the previous calendar year;

  d.     A summary of the miles of main lines and the number of Lower Laterals cleaned in the previous calendar year;

  e.     Confirmation that training for all SASD personnel responsible for responding to SSOs has been performed at least once in the prior calendar year.

### XIV.   PAYMENT OF LITIGATION COSTS, MONITORING OF CONSENT DECREE COMPLIANCE, AND MITIGATION PAYMENT

36.     <u>Litigation Fees and Costs</u>.  To help defray the Alliance's attorney, consultant, and expert fees and costs, and any other costs incurred as a result of investigating, filing this action, and negotiating a settlement, Defendants shall pay Plaintiff the sum of  $155,000 which shall include all attorneys' fees and costs for all services performed by and on behalf of the Alliance by its attorneys and consultants up to and through the Effective Date of this Consent Decree.  The payment shall be made on or before thirty (30) Days following the Effective Date.  The payment shall be made by check or Automated Clearing House (ACH) to the Aqua Terra Aeris Law Group, LLP, and shall constitute full payment for all costs of litigation incurred by the Alliance that have or could have been claimed in connection with or arising out of the Alliance's lawsuit, up to and including the Effective Date.

37.     <u>Compliance Monitoring</u>.  To compensate Plaintiff for time to be spent by legal staff or technical consultants reviewing compliance reports and monitoring Defendants' compliance with the terms of this Consent Decree, Defendants shall pay $50,000.  The payment shall be made on or before

thirty (30) Days following the Effective Date.  The payment shall be made in the form of a check or ACH payable to Aqua Terra Aeris Law Group, LLP.

38.   Mitigation Payment.  Defendants shall provide additional funding to the existing private sewer lateral repair or replacement program, including a full or partial loan program, in the amount of $100,000 per year for the life of the Consent Decree. The program will include a loan forgiveness component for low-income residents to the extent allowed by law.

## XV.   SUBMISSION OF CONSENT DECREE FOR AGENCY REVIEW

39.   The Alliance shall submit a copy of this Consent Decree to EPA and the United States Department of Justice ("DOJ") within three (3) Days of its execution for agency review consistent with 40 C.F.R. § 135.5.

40.   In the event that EPA or DOJ comment negatively on the provisions of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by EPA or DOJ.

## XVI.   DISPUTE RESOLUTION PROCEDURES

41.   Force Majeure.  Defendant(s) shall notify the Alliance pursuant to the terms of this paragraph, when implementation of the requirements set forth in this Consent Decree, within the deadlines set forth in those paragraphs, becomes impossible, despite the timely good-faith efforts of Defendant(s), due to circumstances beyond the control of Defendant(s) or its agents, and which could not have been reasonably foreseen and prevented by the exercise of due diligence by Defendant(s).  Any delays due to Defendant(s)' failure to make timely and bona fide applications and to exercise diligent efforts to comply with the terms in this Consent Decree in normal inclement weather shall not, in any event, be considered to be circumstances beyond Defendant(s)' control. Financial inability shall not, in any event, be considered to be circumstances beyond Defendant(s)' control.

a.   If Defendant(s) claims impossibility, it shall notify the Alliance in writing within fourteen (14) Days of the date that Defendant(s) first knew of the event or circumstance that caused or would cause a violation of this Consent Decree, or the date Defendant(s) should have known of the event or circumstance by the exercise of due diligence. The notice shall describe the reason for the nonperformance and specifically refer to this Section of this Consent Decree. It shall describe the

anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by Defendant(s) to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance. Defendant(s) shall adopt all reasonable measures to avoid and minimize such delays.

b.      The Settling Parties shall meet and confer in good faith concerning the non-performance and, where the Settling Parties concur that performance was or is impossible, despite the timely good faith efforts of Defendant(s) and due to circumstances beyond the control of Defendant(s) that could not have been reasonably foreseen and prevented by the exercise of due diligence by Defendant(s), new performance deadlines shall be established.

c.      If the Alliance disagrees with Defendant(s)' notice, or in the event that the Settling Parties cannot timely agree on the terms of new performance deadlines or requirements, either Settling Party shall have the right to invoke the Dispute Resolution Procedures pursuant to Paragraph 44 of this Consent Decree.  In such proceeding, Defendant(s) shall bear the burden of proving that any delay in performance of any requirement of this Consent Decree was caused or will be caused by force majeure and the extent of any delay attributable to such circumstances.

42.      The Settling Parties agree that any action or proceeding which is brought by any Settling Party against any other Settling Party pertaining to, arising out of or related to the requirements of this Consent Decree shall first use the Informal Dispute Resolution meet and confer proceedings set forth in the preceding paragraph and, if not successful, the Settling Parties shall use the Formal Dispute Resolution procedures in this paragraph.

43.      Informal Dispute Resolution.  The Settling Parties agree to engage in Informal Dispute Resolution pursuant to the terms of this paragraph:

a.      If a dispute under this Consent Decree arises, or any Settling Party believes that a breach of this Consent Decree has occurred, the Settling Parties shall meet and confer (telephonically or in-person) within ten (10) Days of receiving written notification of a request for such meeting. During the meet and confer proceeding, the Settling Parties shall discuss the dispute and make best efforts to devise a mutually acceptable plan, including implementation dates, to resolve the dispute. The Settling

Parties may, upon mutual written agreement, extend the time to conduct the meet and confer discussions beyond ten (10) Days.

        b.     If any Settling Party fails to meet and confer within the timeframes set forth in paragraph 43.a., or the meet and confer does not resolve the dispute, after at least ten (10) Days have passed after the meet and confer occurred or should have occurred, either Settling Party shall be entitled to initiate the Formal Dispute Resolution procedures outlined in paragraph 44 below.

    44.    <u>Formal Dispute Resolution</u>. The Settling Parties agree that Formal Dispute Resolution shall be initiated by filing a Motion to Show Cause or other appropriately titled motion ("Motion") in the United States District Court, Eastern District of California, to determine whether either party is in violation of this Consent Decree and, if so, to require the violating party to remedy any violation identified by the District Court. The Settling Parties agree to stipulate to an expedited review of the Motion by the Court if requested by any Settling Party.

    45.    Litigation costs and fees incurred in resolving any dispute, including an alleged breach of this Consent Decree, shall be awarded in accord with the standard established by section 505 of the Clean Water Act, 33 U.S.C. § 1365, and case law interpreting that standard.

## XVII.  STIPULATED PAYMENT

    46.    <u>Payments for Failure to Submit Reports as Required</u>:  Defendants agree to pay stipulated payments in the event reports required by this Consent Decree are not timely submitted.

    47.    The Defendants shall pay the following stipulated payments in the event that they file a late report covered herein after the grace period:

        a.     For a report submitted after the grace period, the Defendants shall pay One Hundred Dollars ($100.00) per Day until the report is submitted, up to thirty (30) Days for a total amount of $3,000.00.

        b.     For any report more than thirty (30) Days late, the Defendants shall pay Five Thousand Dollars ($5,000.00).

        c.     For any report more than ninety (90) Days late, the Defendants shall pay Seven Thousand Dollars ($7,000.00).

d.      The above payments are cumulative, as applicable, to a maximum payment of Fifteen Thousand Dollars ($15,000.00) per report.

48.      In the case of a late report, the Defendants shall send the Alliance the report per Section XIII of this Consent Decree.  The Alliance shall notify the Defendant(s) of receipt of the late report and shall include an invoice for the amount of the stipulated payment, if any, due and payable. The Defendant(s) shall contact the Alliance within ten (10) working Days if the Defendant(s) disagrees with the Alliance's stipulated payment calculation and may meet and confer with the Alliance or seek dispute resolution pursuant to Section XVI of this Consent Decree.  The Defendant(s) shall pay any stipulated payments due pursuant to this Consent Decree within thirty (30) Days after receipt of the Alliance's invoice itemizing the stipulated payment liability, or thirty (30) Days after resolution of a dispute if the dispute resolution process has been invoked pursuant to Section XVI of this Consent Decree.

49.      All payments of stipulated payments described in this Consent Decree shall be paid by the Defendants to the Rose Foundation for Communities and the Environment and sent via overnight mail to: Rose Foundation for Communities and the Environment, 201 4th St., Ste. 102, Oakland, California 94607, Attention: Tim Little. The Rose Foundation shall use the payments for projects that mitigate the impact of sewer system overflows to the Sacramento River/Bay Delta system.

50.      Nothing in this Consent Decree shall prevent the Alliance from waiving any stipulated payments, which might be due under this Section, based on the outcome of the Informal Dispute Resolution process, or based on the Defendants' good faith efforts.

## XVIII. NOTICES AND SUBMISSIONS

51.      Defendants agree to provide Plaintiff with all documents or reports required by this Consent Decree.  All documents shall be directed to the following individuals at the addresses specified below unless specifically stated otherwise herein.  Any change in the individuals or addresses designated by any party must be made in writing to all Settling Parties.

If to the Alliance:

    Drevet Hunt, Legal Director
    California Coastkeeper Alliance
    1100 11th Street, 3rd Floor
    Sacramento, California 95814
    Phone: (415) 606-0864
    Fax: (415) 520-6125
    Email: dhunt@cacoastkeeper.org

    Jason R. Flanders
    4030 Martin Luther King Jr. Way
    Oakland, California 94609
    Telephone: (916) 202-3018
    Email: jrf@atalawgroup.com

If to the Defendants:

    Brittany K. Johnson
    Simmons & Dunn, LLP
    500 Capitol Mall, Suite 1000
    Sacramento, California 95814
    Telephone: (916) 446-7979
    Fax: (916) 446-8199
    Email: bjohnson@somachlaw.com

    Janice M. Snyder
    County of Sacramento
    Office of the County Counsel
    700 H Street, Ste. 2650
    Sacramento, CA  95814
    Telephone:  (916) 874-5506
    Fax:  (916) 874-8207
    Email:  snyderja@saccounty.gov

52.    Defendants also agree to make available to the Alliance any existing documents within the Defendants' custody or control that are reasonably necessary to evaluate system performance and/or compliance with this Consent Decree within sixty (60) Days of written request by the Alliance.

53.    During the life of this Consent Decree, Defendants shall preserve at least one legible copy of all records and documents, including computer-stored information, which relate to performance of its obligations under this Consent Decree.

54.    Any notice, report, certification, data presentation or other document submitted by Defendants to the Alliance pursuant to this Consent Decree, which discusses, describes, demonstrates, or supports any finding or makes any representation concerning compliance or non-compliance with any

requirement(s) of this Consent Decree, shall contain the following certification, signed and dated by a responsible official:

> I certify, under penalty of perjury, that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted and is, to the best of my knowledge and belief, true, accurate and complete.

## XIX.   MUTUAL RELEASE OF LIABILITY

55.     Upon the District Court's approval and entry of this Consent Decree, the Settling Parties and their successors and assigns,  release all persons, including the Defendants and their respective successors and assigns, past and present, from, and waives all claims, for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed related to Plaintiff's First Cause of Action in this case, up to the Effective Date of this Consent Decree.  This release by the settling parties includes a release, and covenant not to sue, for any claims of injunctive relief, damage, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts and others), costs, expenses or any other sum incurred or claimed based on facts or allegations set forth in the Notice Letter and/or Complaint, related to Plaintiff's First Cause of Action, up to the Effective Date of this Consent Decree.

56.     Nothing in this Consent Decree limits or otherwise affects the Alliance's right to address or take any position that it deems necessary or appropriate in any formal or informal proceeding before any judicial or administrative body on any other matter relating to Defendants.

## XX.     GENERAL PROVISIONS

57.     Continuing Jurisdiction.  The Settling Parties stipulate that the District Court shall retain jurisdiction to enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree up to and including the Termination Date in paragraph 10.

58.     Construction.  The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in Section II above.

59.     Choice of Law.  The laws of the United States shall govern this Consent Decree.

60.    <u>Severability</u>.  In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a Court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

61.    <u>Counterparts</u>.  This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopy, scanned copies (i.e., pdf) and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

62.    <u>Modification of the Consent Decree</u>.  This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties.

63.    <u>Full Settlement</u>.  This Consent Decree constitutes a full and final settlement of this matter.

64.    <u>Integration Clause</u>.  This is an integrated Consent Decree.  This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

65.    <u>Authority</u>.  The undersigned representatives for the Alliance and the Defendants each certify that he/she is fully authorized by the Settling Party whom he/she represents to enter into the terms and conditions of this Consent Decree.

The Settling Parties hereby enter into this Consent Decree.

Date: January  30   , 2023                    COUNTY OF SACRAMENTO


                                              <u>/s/</u>
                                              By:  Michael L. Peterson


Date: January 31   , 2023                     SACRAMENTO AND SACRAMENTO AREA
                                              SEWER DISTRICT


                                              <u>/s/</u>
                                              By:  Christoph Dobson

1  Date: January 24, 2023                         CALIFORNIA COASTKEEPER ALLIANCE

2

3                                                 /s/
                                                  By: Sean Bothwell
4

5

6  APPROVED AS TO FORM:                           For DEFENDANTS COUNTY OF
                                                  SACRAMENTO AND SACRAMENTO AREA
7                                                 SEWER DISTRICT:

8  Date: January _31___, 2023                     SOMACH SIMMONS & DUNN, PC

9

10                                                /s/
                                                  By: Brittany K. Johnson
11

12                                                For PLAINTIFF CALIFORNIA COASTKEEPER
                                                  ALLIANCE:
13

14 Date: January 24, 2023                         AQUA TERRA AERIS LAW GROUP

15                                                /s/
                                                  By: Jason R. Flanders
16

17

18 Date: January 24, 2023                         CALIFORNIA COASTKEEPER ALLIANCE

19                                                /s/
                                                  By: Drevet Hunt
20

21 Date: January 24, 2023

22

23                                                SYCAMORE LAW

24

25

26                                                /s/
                                                  By: Daniel Cooper
27

28

---

1  **IT IS SO ORDERED.**

2

3

Dated:  February 3, 2023

4

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28